Nos. 15-1370, 15-1426

## IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

MAG AEROSPACE INDUSTRIES, INC. (NOW KNOWN AS
MAG AEROSPACE INDUSTRIES, LLC),

*Plaintiff-Appellant,*

*v.*

B/E AEROSPACE, INC.,

*Defendant-Appellee and
Cross-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
IN No. 2:13-cv-06089-SJO-FFM, THE HONORABLE S. JAMES OTERO

**PRINCIPAL AND RESPONSE BRIEF OF
APPELLEE AND CROSS-APPELLANT
B/E AEROSPACE, INC.
<u>NONCONFIDENTIAL</u>**

Morgan Chu
Andrei Iancu
Richard Birnholz
Harry Mittleman
Melissa Sedrish Rabbani
Benjamin Haber
**IRELL & MANELLA LLP**

1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
(310) 277-1010

*Attorneys for Defendant-Appellee and Cross-Appellant B/E Aerospace, Inc.*

July 23, 2015

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee and Cross-Appellant B/E Aerospace, Inc. certifies the following:

1.     The full name of every party or amicus represented by us is:

B/E Aerospace, Inc.

2.     The names of all real parties in interest (if the party named in the caption is not the real party in interest) represented by us are: N/A

3.     All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by us are: None.

4.     The names of all law firms and the partners or associates that have appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this court are:

From Irell & Manella LLP: Morgan Chu, Andrei Iancu, Richard M. Birnholz, Harry A. Mittleman, Melissa Sedrish Rabbani, Benjamin Haber, Christopher Vanderlaan (trial court), Grace Chen (trial court) and Daniel Switts (trial court).

Dated: July 23, 2015

/s/ Andrei Iancu
Andrei Iancu

*Counsel for Defendant-Appellee and Cross-Appellant B/E Aerospace, Inc*

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ............................................................ vii

STATEMENT OF JURISDICTION ................................................................ viii

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF THE ISSUES .................................................................... 4

STATEMENT OF THE CASE ...................................................................... 5

I.     THE PARTIES .................................................................................. 5

II.    THE ASSERTED PATENTS .......................................................... 5

      A.     The '054 Patent ..................................................................... 6

      B.     The '055 Patent ..................................................................... 9

      C.     The '942 Patent ..................................................................... 10

III.   THE DISTRICT COURT PROCEEDINGS ....................................... 13

      A.     Claim Construction ............................................................... 13

             1.     '054 Patent: "Toollessly" Means "without the use of any tools".......................................................... 13

             2.     '055 Patent: "Line Replaceable Unit" Means "a single module targeted for easy replacement in the field" ................................................................................ 14

             3.     '942 Patent: "Out-Turned Flange" Means "outside rim or edge turned away from the sidewall, transferring loads to the top of the support structure".................................................................... 15

      B.     Summary Judgment ............................................................... 16

             1.     B/E's Non-Infringement Motion ..................................... 16

             2.     MAG's Assignor Estoppel Motion.................................. 17

**Page**

3.  Final Judgment................................................................ 18

SUMMARY OF ARGUMENT .................................................... 19

ARGUMENT .............................................................................. 22

I.  STANDARD OF REVIEW ................................................ 22

II.  THE DISTRICT COURT CORRECTLY GRANTED
SUMMARY JUDGMENT OF NO INFRINGEMENT OF THE
'054 PATENT ...................................................................... 22

A.  There Is No Genuine Factual Dispute That B/E's Toilet
Bowl Is Inserted And Removed With A Tool, Not
"Toollessly" ............................................................... 23

B.  There Is No Genuine Factual Dispute That A Coin Is A
Tool When Used To Release The Fasteners And
Remove The Bowl ...................................................... 29

III.  THE DISTRICT COURT CORRECTLY GRANTED
SUMMARY JUDGMENT OF NO INFRINGEMENT OF THE
'055 PATENT ...................................................................... 34

A.  B/E's Flush Valve And ISC Do Not Constitute A
"Single Module Targeted For Easy Replacement In The
Field"......................................................................... 35

B.  B/E's Flush Valve And Flush Control Unit Do Not
Constitute A "Valve Set"........................................... 39

C.  MAG Has No Evidence That B/E's Flush Valve And
Flush Control Unit Have Ever Been Removed On
Aircraft ("In The Field").......................................... 43

IV.  THE DISTRICT COURT CORRECTLY GRANTED
SUMMARY JUDGMENT OF NO INFRINGEMENT OF THE
'942 PATENT ...................................................................... 46

A.  The District Court Correctly Construed "Flange" To Be
"An Outside Rim Or Edge Turned Away From The
Sidewall," Which Does Not Include "Ribs"............... 47

**Page**

    B.    There Is No Genuine Issue Of Fact That B/E's Toilets Lack The Required "Out-Turned Flange" ................................ 51

        1.    MAG's Alleged "First Surface" Cannot Meet The Claims At Least Because It Does Not Transfer Loads To The Top Of The Support Structure................. 52

        2.    MAG's Alleged "Second Surface" Is Not A "Flange" That Transfers Loads To The Top Of The Support Structure ............................................ 57

    C.    The District Court Did Not Apply A Revised Construction .................................................................... 58

**B/E AEROSPACE'S CROSS APPEAL** ...................................................... 60

I.    **INTRODUCTION** .............................................................................. 60

II.    **THE DISTRICT COURT INCORRECTLY APPLIED ASSIGNOR ESTOPPEL TO BAR B/E'S INVALIDITY DEFENSE**.................................................................................. 61

    A.    Standard Of Review For Assignor Estoppel............................ 61

    B.    Assignor Estoppel Should Be Applied Only To Prevent Unfairness And Injustice ......................................... 61

    C.    This Court's *Shamrock* "Factors" Do Not Warrant A Finding Of Privity For Purposes Of Assignor Estoppel ........... 64

    D.    The District Court Incorrectly Held B/E's Work With Mr. Pondelick To Avoid Infringing The Patents-In-Suit Was "Not Relevant"................................................................. 67

    E.    The Balance Of Equities Demonstrates That No Assignor Estoppel Should Apply In This Case ........................ 68

**CONCLUSION**............................................................................................ 71

## **CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 8, 22, 52, 62, 63, and 67 include sensitive technical details of B/E's products. The material omitted on pages 8, 10, 22-25, 27, 35-38, 41-43, 65, and 66 includes sensitive information regarding B/E's technical documentation, B/E revenues, or sensitive information about B/E personnel. The material omitted on pages 26-28 includes witness testimony regarding B/E's technical documentation, or marketing efforts.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. Aukerman Co. v. R.L. Chairdes Construction Co.*,
    960 F.2d 1020 (Fed. Cir. 1992) ............................................................ 61

*Acushnet Co. v. Dunlop Maxfli Sports Corp.*,
    No. CIV. A. 98-717-SLR,
    2000 WL 987979 (D. Del. June 29, 2000) ............................................ 70

*AquaTex Indus. Inc., v. Techniche Solutions*,
    479 F.3d 1320 (Fed. Cir. 2007) ............................................................ 35

*Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*,
    402 U.S. 313 (1971)............................................................................. 70

*Cephalon, Inc. v. Abraxis Bioscience, LLC*,
    __ Fed. App'x __, No. 2014-1411,
    2015 WL 3756870 (Fed. Cir. June 17, 2015)................................. 49, 50

*Daub v. Eagle Test Sys., Inc.*,
    No. C-05-01055 RMW,
    2006 WL 3782877 (N.D. Cal. Dec. 21, 2006)....................................... 25

*Diamond Scientific Co. v. Ambico, Inc.*,
    848 F.2d 1220 (Fed. Cir.1988) ............................................ 61, 62, 68, 69

*Earth Resources v. U.S.*,
    44 Fed. Cl. 274 (1999).................................................................... 63, 66

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    353 U.S. 722 (2002)............................................................................. 50

*Greater Yellowstone Coal. v. Lewis*,
    628 F.3d 1143 (9th Cir. 2010) .............................................................. 22

*In Re Indian Palms Associates, Ltd.*,
    61 F.3d 197 (3d Cir. 1995) ................................................................... 45

*Intel Corp. v. U.S. Intern. Trade Com'n*,
    946 F.2d 821 (Fed. Cir. 1991) ................................................... 63, 67, 68

*Jordan v. Columbia Cnty. Bd. of Educ.*,
    492 F. App'x 956 (11th Cir. 2012)........................................................ 25

*Karsten Mfg. Corp. v. Cleveland Golf Co.*,
    242 F.3d 1376 (Fed. Cir. 2001) ............................................................ 22

**Page(s)**

*Lexion Med., LLC v. Northgate Techs., Inc.*,
    641 F.3d 1352 (Fed. Cir. 2011) ............................................................... 22

*Limelight Networks, Inc. v. Akamai Technologies, Inc.*,
    134 S. Ct. 2111 (2014) ............................................................................. 43

*M. Prusman Ltd. v. M/V Nathanel*,
    684 F. Supp. 372 (S.D.N.Y. 1988) .......................................................... 25

*Mentor Graphics Corp. v. Quickturn Design Systems, Inc.*,
    150 F.3d 1374 (Fed. Cir. 1998) ............................................................... 63

*Novartis Corp. v. Ben Venue Labs., Inc.*,
    271 F.3d 1043 (Fed. Cir. 2001) ............................................................... 54

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ............................................................... 41

*Oto v. Metro. Life Ins. Co.*,
    224 F.3d 601 (7th Cir. 2000) ................................................................... 25

*Pandrol USA, LP v. Airboss Ry. Products, Inc.*,
    424 F.3d 1161 (Fed. Cir. 2005) ............................................................... 61

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,
    984 F.2d 1182 (Fed. Cir. 1993) ............................................................... 28

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................................................... 30

*Precision Instrument Mfg. Co. v. Auto Maint. Mach. Co.*,
    324 U.S. 806 (1945) ................................................................................. 69

*Q.G. Prods., Inc. v. Shorty, Inc.*,
    992 F.2d 1211 (Fed. Cir. 1993) ............................................................... 62

*Rakity v. Dillon Cos., Inc.*,
    302 F.3d 1152 (10th Cir. 2002) ............................................................... 28

*SanDisk Corp. v. Memorex Products, Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005) ............................................................... 29

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ............................................................... 31

*Scott v. Harris*,
    550 U.S. 372 (2007) ..................................................................... 22, 26, 28

**Page(s)**

*Shamrock Technologies, Inc. v. Medical Sterilization, Inc.*,
    903 F.2d 789 (Fed. Cir. 1990) ......................................................................... passim

*Sitrick v. Dreamworks,*
    *LLC*, 516 F.3d 993 (Fed. Cir. 2008) ....................................................................... 28

*SmithKline Beecham Corp. v. Apotex Corp.,*
    439 F.3d 1312 (Fed. Cir. 2006) ....................................................................... 29, 51

*State Indus. Inc. v. A.O. Smith Corp.*,
    751 F.2d 1226 (Fed. Cir. 1985) ............................................................................. 70

*Teva Pharm. USA, Inc. v. Sandoz, Inc. Momenta Pharms., Inc.*,
    __ F.3d __, 2015 WL 3772402 (Fed. Cir. June 18, 2015) ................................ passim

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ....................................................................... 30, 31

## Statutes

28 U.S.C. § 1295 ..................................................................................................... viii

## Rules

Federal Rule of Evidence 201 ................................................................................. 45

## <u>STATEMENT OF RELATED CASES</u>

Defendant-Appellee and Cross-Appellant B/E Aerospace, Inc. agrees with the statement of related cases provided by Plaintiff-Appellant MAG Aerospace Industries, LLC.

### STATEMENT OF JURISDICTION

Defendant-Appellee and Cross-Appellant B/E Aerospace, Inc. ("B/E") agrees with Appellant MAG Aerospace Industries, LLC's ("MAG") statement of jurisdiction as it concerns MAG's appeal from the district court's final judgment that B/E did not infringe any asserted patent.

B/E has cross-appealed the district court's decision to grant MAG's Motion for Summary Judgment of No Invalidity on the Grounds of Assignor Estoppel. A3, A7-12. In light of this ruling, on February 23, 2015, the district court entered a final judgment dismissing B/E's First, Second and Third Counterclaims seeking a declaratory judgment that each of the Asserted Patents is invalid. A2. On March 9, 2015, B/E filed its Notice of Cross-Appeal with respect to this aspect of the judgment. A8145-47. This Court has jurisdiction over B/E's cross-appeal under 28 U.S.C. § 1295(a)(1).

## PRELIMINARY STATEMENT

In response to B/E Aerospace, Inc.'s ("B/E") success in the marketplace with its new and innovative products for aircraft interiors, MAG Aerospace Industries, LLC ("MAG") resorted to asserting far-fetched claims of patent infringement. MAG's patents are directed to three specific features of a vacuum toilet assembly: (1) a toilet bowl that is inserted into and removed from the toilet frame "toollessly," without using any tools (the '054 patent); (2) a particular "valve set" forming a "line replaceable unit," a single module targeted for easy replacement in the field (the '055 patent); and (3) a toilet bowl with a particular kind of support, an "out-turned flange," to transfer loads to the toilet frame (the '942 patent). The district court correctly entered summary judgment of no infringement because B/E's products have none of these features.

The undisputed facts confirm that MAG cannot prevail. MAG cannot establish infringement of the '054 patent because B/E's toilet bowl is not removed "toollessly." To the contrary, it is held in place by two fasteners that require a tool, such as a screwdriver or a coin, to release them. MAG ignores this fundamental reality and improperly tries to rewrite the claims to exclude the use of only *certain kinds* of tools, and advances the baseless argument that a coin used to remove the fasteners is not a tool. MAG's claim under the '055 patent fails because MAG cannot prove that B/E toilets have a "valve set" in

which components are combined to form a "line replaceable unit." MAG incorrectly relies on separate components performing separate functions that are not serviced or maintained together. MAG's claims under the '942 patent likewise fail because B/E's toilet does not contain a bowl configured with an "out-turned flange." B/E's toilets were instead designed with ribs, an entirely different structure the district court found not to be a "flange" as that term would be understood by a person of skill in the art. This underlying factual finding is entitled to deference under *Teva*.

Although the district court correctly ruled that B/E does not infringe any of MAG's patents, B/E has separately cross-appealed from the district court's order that assignor estoppel bars B/E from arguing invalidity. The district court held that B/E was estopped because it allegedly is in "privity" with one of the inventors of the patents-in-suit, Mark Pondelick, who became a B/E employee. B/E is aware of no case in which assignor estoppel was applied as a result of a large company's employment of one out of many named inventors with no meaningful financial interest in the company, and when the company specifically and successfully worked in good faith to avoid infringement. In contrast to this Court's "privity" precedents, B/E did not use Mr. Pondelick's knowledge and assistance to conduct infringement, but rather to avoid it. The assignor estoppel doctrine should not be extended to the facts of this case.

The judgment of no infringement should be affirmed. The judgment dismissing B/E's invalidity defense and declaratory relief counterclaims because of assignor estoppel should be reversed.

## STATEMENT OF THE ISSUES

Appellee and Cross-Appellant B/E Aerospace, Inc. disagrees with MAG's statement of issues. The questions presented on MAG's appeal are:

1.    Whether the district court correctly granted summary judgment of no infringement of the '054 patent because MAG cannot prove that the B/E toilet bowls are inserted and removed toollessly;

2.    Whether the district court correctly granted summary judgment of no infringement of the '055 patent because MAG cannot prove that the B/E toilets have the required "valve set" forming a "line replaceable unit";

3.    Whether the district court correctly granted summary judgment of no infringement of the '942 patent because MAG cannot prove that the B/E toilets have an "out-turned flange" as the claims require.

The question presented on B/E's cross-appeal is:

4.    Whether the district court erred in barring B/E from asserting any defense of invalidity and dismissing B/E's invalidity counterclaims based on the equitable doctrine of assignor estoppel when the inventor who joined B/E as an employee has a negligible financial interest in B/E, when B/E already had started work on the accused products and selected design facilities before hiring the inventor, and when B/E affirmatively sought to avoid infringement.

- 4 -

## STATEMENT OF THE CASE

B/E provides this complete statement of the case to provide additional background and context for this appeal.

## I.    THE PARTIES

B/E and MAG compete in the design, manufacture, and sale of aircraft cabin equipment, such as seating, galley equipment and lavatories, among many other things. MAG and its affiliated companies have been dominant players in the aircraft vacuum toilet market for decades. A7189, A7199. Although B/E has been a major competitor for various other aircraft interior components, B/E historically had not sold aircraft toilets. In 2010, B/E introduced a highly advanced and innovative aircraft lavatory and next-generation vacuum toilet. B/E's products were different from MAG's and received critical and commercial acclaim upon their introduction, threatening MAG's market dominance. *See, e.g.,* A2198.

## II.    THE ASSERTED PATENTS

Concerned that its legacy products were not competitive with B/E's next-generation toilets, MAG resorted to litigation. On August 20, 2013, MAG filed a complaint alleging that B/E's manufacture and sale of aircraft vacuum toilets infringe three patents. A358-67. Specifically, MAG asserted U.S. Patent Nos. 6,536,054 (the '054 patent), 6,536,055 (the '055 patent) and 6,353,942

(the '942 patent), each of which relates to vacuum toilet assemblies and methods for servicing these toilets.

### A.    The '054 Patent

The '054 patent is entitled "Vacuum Toilet Bowl Assembly Having Removable Bowl." The disclosure and claims focus on a toilet whose bowl is removable from the rest of the toilet without the use of any tools. The specification explains how prior art toilet repair may have been "difficult and time consuming" because various fasteners and connections had to be disassembled to access the bowl and other components. A148 (1:45-51). "Each connection may be difficult to access, and may require a particular tool in order to loosen and disconnect." A148 (1:51-53). To avoid the need for any tools, the patent describes a configuration where the toilet frame has slots and the bowl has tabs designed to engage the slots. A148 (2:47-58).

The basic structure is set out in Figure 4 of the '054 patent. A147. As depicted, the toilet bowl may be held in place with a tab 39 on the bowl that engages with a corresponding slot 29 in the toilet support frame:



FIG. 4

This design allows for the bowl to be removed toollessly: "[T]he tabs 39 may be manipulated manually, and therefore no tools are required to install or remove the bowl 36." A149 (4:6-9); *id.* (4:30-31) (describing how a maintenance person can reach under the toilet frame and "manipulate the tabs 39 so that the [tabs] are disengaged from the slots 29"). The specification elaborates: "The bowl replacement process is not only fast, but does not require the use of any tools." A149 (4:37-38).

All claims of the '054 patent require "toollessly" inserting and removing the toilet bowl. Claims 1-9, for example, require "wherein the receptacle is *toollessly* inserted into and removed from the installed position independent of the frame." A149 (4:65-67) (claim 1).[1]

---

[1] Only claims 1, 4-7, and 9 are at issue in this appeal. MAG also initially asserted claims 10, 12-15 and 17, but presented no evidence on them. A16. The district court ruled that in addition to MAG's failure to pursue these claims, B/E does not infringe for the same reasons as the other claims. A16-17. MAG

Protective Order Material Removed

The accused B/E toilet assemblies do not use the "toolless" configuration that the '054 patent requires. To the contrary, the B/E unit specifically requires the use of a tool to remove two fastening screws. The bowl is secured to the front of the unit using these two screws, which require the use of a screwdriver or other tool to remove them:



A2159; A7777-78. The screws lock the toilet bowl in position. These screws are not designed to be removed by hand, and are not removable by hand; they include a traditional slot for a flat-head screwdriver for rotation and removal.

A2058.

---

acknowledges (at 1 n.1) that claim 10 and its dependent claims are not at issue on appeal.

### B.    The '055 Patent

MAG asserted claims 15-16, 20-21, and 24-26 against B/E, each of which is directed to combining certain sub-components of the toilet assembly together into a set in order to facilitate their unitary removal for service in the field. The claims require a vacuum toilet in which any two of a rinse valve, discharge valve, and flush control unit are packaged together as a "valve set" defining a "line replaceable unit" (or "LRU").

The configuration is depicted in Figure 4 which shows the "valve set" in which all three of these components are packaged together:



A241 (Fig. 4). The specification explains: "it will be appreciated that the valve set 8 of the present invention incorporates all of the valve and control apparatus. The rinse valve 72, FCU 74, and actuator 76 are all mounted to the

Protective Order Material Removed

discharge valve 70 to create an LRU, wherein a single module may be targeted for maintenance in the event of a valve or control failure." A250 (9:45-51).

The accused B/E toilet uses a different configuration. None of the B/E components are packaged together as either a set or as an LRU. B/E's components instead are each separate with their own individual part numbers and are marked, sold, serviced, and replaced independently—never as a unit or set targeted for replacement together. A2640 ███████████████████

████████████████████████████████████████████████

██████████████████████████████████████ B/E's service documents explicitly require that the components be removed one after the other, not together. A2641-42 █████████████████████████

█████████████████████████████████

## C.    The '942 Patent

The '942 patent is the parent of the '055 patent, and shares an identical specification. The '942 patent discloses a modular vacuum toilet in which the toilet bowl is supported on the top of a structural support frame by an out-turned flange around the opening of the toilet bowl. The flange is depicted in Figure 1A of the '942 patent, as item 40:



FIG. IA

A43 (Fig. 1A) (annotated). The specification explains: "The bowl 36 has a curved sidewall 38 and an out-turned flange 40 extending about an upper edge of the sidewall." A52 (4:53-55). "[T]he out-turned flange 40 closely overlies the frame top member 28 so that the downward forces applied to the bowl 36 are transferred to the frame 20. As a result, the bowl 36 is not a load-bearing component, and may be made of non-structural materials such as plastic, thin-walled metal (defined herein as less than approximately 0.040" thick), or other known alternatives." A53 (5:4-10). The "out-turned flange" element was added during prosecution to distinguish the bowl's specific support mechanism from the prior art. A124.

Protective Order Material Removed

MAG asserted claims 13-14, 18-19, and 22-24 against B/E. Each claim requires, among other things, the "out-turned flange" element.

The accused B/E toilet bowl uses a fundamentally different configuration. Instead of a bowl designed with an "out-turned flange" that supports it on the frame, the B/E bowl is supported by vertical ribs on the side of the load-bearing bowl. B/E's expert, NASA Astronaut Dr. Gregory Chamitoff, identified the ribs in B/E's toilet:



A2597-98. ██████████████████████████████████

███████████████████████████████  A2290.

## III.  THE DISTRICT COURT PROCEEDINGS

### A.  Claim Construction

The district court issued a *Markman* order on July 24, 2014 construing several terms of the asserted patents. A26-41. The terms most pertinent to this appeal are addressed below.

#### 1.  '054 Patent: "Toollessly" Means "without the use of any tools"

The district court held that "toollessly" means "without the use of any tools." A38. The district court expressly rejected MAG's argument that "toollessly" excludes only the use of "conventional mechanics' tools": "[T]he claims and specification never describe the types of tools that could or could not be used to remove or install the toilet, nor does the patent make any reference to mechanics. Further, that these toilets are typically repaired by mechanics does not compel the interpretation that the term 'toollessly' is limited only to those tools commonly used by mechanics." A39. The district court found nothing in the specification to suggest that "toolless" removal can occur "with the use of unconventional mechanics tools, conventional non-mechanics' tools, or indeed any tools at all." A38. The district court thus rejected on claim construction MAG's argument that the claims could encompass "a repair made with a simple device not commonly thought of as a tool, such as a coin." *Id.*

## 2. '055 Patent: "Line Replaceable Unit" Means "a single module targeted for easy replacement in the field"

The '055 patent describes a "valve set" that is a "line replaceable unit" (LRU). The district court construed LRU to mean "a single module targeted for easy replacement in the field." A41. This unchallenged claim construction tracks the specification, which explains how the invention pertains to "a modular vacuum toilet" featuring two "single modules": (1) a "waste receptacle" and (2) a "valve set." A236 (Abstract); A246 (2:54-57); A248 (5:39-40); A250 (9:61-63). The "valve set" is packaged together "to create an LRU, wherein a single module may be targeted for maintenance." A250 (9:49-50). The LRUs are "targeted" for replacement "in the field"—such as replacing components on a toilet "installed on board" an aircraft that must be "swapped" out *in situ*—and not in a repair shop. A246 (1:41-52); *see also* A1061 (Department of Defense manual *Performance Specification, Logistics Management Information*, MIL-PRF-49506, which explains that "*an LRU* is an essential support item which *is removed and replaced at field level. . . .*").

### 3.   '942 Patent: "Out-Turned Flange" Means "outside rim or edge turned away from the sidewall, transferring loads to the top of the support structure"

The '942 patent requires a toilet bowl having "an out-turned flange supported by the top of the support structure." The district court first addressed the parties' dispute regarding the meaning of "flange." MAG requested a construction that the term "flange" includes "ribs." A29. The district court disagreed, holding that the term "out-turned flange" is not broad enough to cover "ribs." A33. The district court also weighed extrinsic evidence and found that it supported the conclusion that a flange did not include ribs. A33. The district court specifically made a finding that "a person having ordinary skill in the art would understand 'flange' to include rims and edges, but not ribs." *Id*. This factual finding underlying claim construction is reviewed for clear error on appeal. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 841-42 (2015). The district court also adopted elements from both parties' proposed constructions and construed the overall phrase to mean "outside rim or edge turned away from the sidewall, transferring loads to the top of the support structure." A34.

### B.    Summary Judgment

#### 1.    B/E's Non-Infringement Motion

On January 23, 2015, the district court granted B/E's motion for summary judgment of no infringement as to all asserted claims. A3-25.

For the '054 patent, the district court held that the accused B/E toilet assemblies do not contain a receptacle that is removed "toollessly." The patent excludes all kinds of tools, whereas B/E's receptacle requires the use of a tool (a coin or other form of screwdriver) to turn and release two fastening screws. A16; *see also* A7942 (summary judgment hearing transcript) at 25:22-24 ("I think I, in that [*Markman*] order, implicitly but clearly rejected the argument that you are making here today that a coin is not a tool.").

For the '055 patent, the district court held that the B/E toilet does not contain a valve set constituting a "single module targeted for easy replacement in the field" (LRU). A23. The district court found the evidence uncontroverted that the flush valve and ISC are not an LRU but instead are separate components sold under separate part numbers and replaced separately during maintenance. *Id*.

For the '942 patent, the district court held that the B/E toilet does not have an "out-turned flange." A21. The record is undisputed that B/E's toilets do not have a rim or edge constituting the required flange. MAG instead relied

on ribs along the side of the toilet, a configuration the district court specifically found outside the scope of the claims. A33; *see also* A44; A7953 at 36:9-11.

### 2.    MAG's Assignor Estoppel Motion

B/E also asserted an affirmative defense and counterclaims of invalidity. A412-23. MAG argued that B/E could not assert any invalidity defense on the ground of "assignor estoppel" because one of the seven named inventors, Mark Pondelick, became a B/E employee. A431-37. MAG moved for summary judgment on this ground.

Even though Mr. Pondelick joined B/E after B/E had started developing the accused toilet, did not select the product design facilities, was only one of a number of engineers who worked on the B/E product, owned a negligible number of shares of B/E, and worked with B/E's outside counsel in good faith to avoid infringement, MAG argued that he was in "privity" with B/E for purposes of assignor estoppel. A1659-78. The district court accepted MAG's argument, finding that B/E's "efforts to avoid infringement are not relevant to whether Mr. Pondelick and [B/E] are in privity." A9. The district court therefore held B/E "estopped from arguing the invalidity of the asserted patents." A12.

### 3.    Final Judgment

On February 23, 2015, the district court entered Final Judgment. A1. MAG appealed the summary judgment of no infringement. A8148-50. B/E timely cross-appealed from the district court's ruling on assignor estoppel. A8145-47.

## SUMMARY OF ARGUMENT

The district court's judgment of no infringement should be affirmed. The undisputed facts confirm that B/E's toilets lack the key features claimed in the asserted patents and that MAG cannot prevail on its claims. Indeed, B/E carefully designed its products to avoid any issue of infringement.

MAG's claims under the '054 patent strain credulity. B/E's toilet bowl is held in place by two fasteners that are released with a tool, such as a screwdriver or a coin. This is precisely a configuration that the specification of the '054 patent criticized and distinguished. MAG's argument that the claims should be rewritten to exclude the use of only *certain kinds* of tools or that a coin is not a tool are baseless. MAG's further argument that B/E's bowl can actually be removed manually (with bare hands or without any tools of any kind) is fiction.

The district court also properly rejected MAG's claims under the '055 patent. For the required "valve set" in which components are combined and form a "line replaceable unit," MAG relied on (1) a flush valve and (2) a flush control unit ("ISC"). But it is undisputed that these are separate parts with separate part numbers that are sold separately. There is no evidence that these two parts are provided together as a set or that they form a "single module targeted for easy replacement in the field." Each must be removed separately, with the ISC removed before the flush valve. The claims also are method

claims, but MAG presented no evidence that the methods have been performed. That is, MAG presented no evidence that the B/E flush valve and ISC actually have been removed and replaced on an aircraft ("in the field"), as the patent requires.

Finally, the district court correctly rejected MAG's claims under the '942 patent. The claims require a toilet bowl configured with a particular kind of support structure, an "out-turned flange," a feature not present in B/E's toilets. The district court construed the term to mean an "outside rim or edge turned away from the sidewall, transferring loads to the top of the support structure." In reaching this conclusion, the district court correctly found that "a person having ordinary skill in the art would understand 'flange' to include rims and edges, but not ribs." A33. The meaning of the claims is a question of law, and the district court's subsidiary fact findings are entitled to deference under *Teva*. This ruling precludes any claim of infringement because B/E's products have ribs, a fundamentally different structure than the required flange.

The district court's summary judgment of no infringement should therefore be affirmed.

Although the district court correctly ruled that B/E does not infringe any of MAG's patents, the district court should not have invoked the doctrine of assignor estoppel to bar B/E's invalidity defenses. The district court held that B/E was estopped because it allegedly is in "privity" with one of the seven

inventors of the patents-in-suit, Mark Pondelick, who became an employee of B/E after the toilet project was started. B/E is aware of no case in which assignor estoppel was applied on similar facts. Mr. Pondelick is one employee out of approximately 10,000 and has only a negligible financial interest in B/E, holding less than one one-thousandth of one percent of B/E's stock. B/E did not use Mr. Pondelick's knowledge and assistance to conduct infringement—to the contrary, B/E instead worked to avoid infringement, and did so successfully. The assignor estoppel doctrine should not be stretched to cover the fact pattern at issue in this case. The judgment dismissing B/E's invalidity defense and claims for declaratory relief of invalidity should be reversed.

## ARGUMENT

### I.    STANDARD OF REVIEW

The Federal Circuit reviews summary judgments under regional circuit law. *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011). The Ninth Circuit reviews summary judgment *de novo*. *Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1148 (9th Cir. 2010). Summary judgment of noninfringement should be affirmed "[w]hen no reasonable jury could find for the nonmovant, [and] the movant is entitled to judgment as a matter of law." *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1379 (Fed. Cir. 2001). The mere existence of some alleged factual disputes does not preclude summary judgment; only *genuine* issues of *material* facts require trial. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

### II.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF NO INFRINGEMENT OF THE '054 PATENT

MAG acknowledged in its opening brief (at 14) that to prove infringement of all claims of the '054 patent MAG had to show that the B/E

Protective Order Material Removed

toilet bowl is removed from the toilet frame "toollessly," meaning "without the use of any tools." Because there is no genuine issue of material fact that "a coin or other tool is necessary to remove the toilet bowl" (A16), the district court correctly granted summary judgment.

### A.    There Is No Genuine Factual Dispute That B/E's Toilet Bowl Is Inserted And Removed With A Tool, Not "Toollessly"

B/E's toilet bowl is attached to its frame with two screw fasteners. A2159; A7777-78. To release the screws and remove the bowl, a screwdriver of some kind is necessary. B/E manuals state ████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████ A2058. Every fact witness who was asked testified that a tool, such as a screwdriver or a coin used as a screwdriver, is necessary to release the screws. A1916-17 at 148:20-149:6; A8152-8155 at 210:20-213:7; A1897-98 at 170:21-171:17; A2549 at 55:9-21; *see also* A1992-93 at 252:15-254:24.

MAG does not deny that the screw fasteners must be released in order to remove the bowl. Nor does MAG contest that a screwdriver is a tool, and that using a screwdriver would not infringe the patent. A1963-64 at 168:25-169:6. Instead, MAG incorrectly relies on certain B/E marketing documents and out-of-context snippets from the deposition of B/E's former Director of Sales and Marketing, Paul Neary, to argue that triable issues of fact exist as to whether

Protective Order Material Removed

the bowl could be removed manually. MAG's argument is based on a distortion of the record, which the district court correctly rejected.

First, B/E's documents do not create genuine issues of fact. B/E's technical documents consistently explain how B/E's toilet bowl is removed by releasing the two screws described above using a tool. █████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ *See, e.g.,* A2662-74 (expert analysis of B/E documents with this and similar language) (emphasis added).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ *See, e.g.,* A2662-74 (emphasis added).

MAG primarily relies on a typographical error that appeared in certain B/E marketing documents, not the technical documents that detail the handling and maintenance of the toilets.████████████████████████

████████████████████████████████████████

████████████████████████████

As the district court held (at A16), the record is uncontroverted that the statement in certain documents upon which MAG relies was a misprint. A1916-17 at 148:1-149:6; A1897-98 at 170:1-171:20; A2662-74; A2019.

Protective Order Material Removed

Every fact witness who was asked testified that the "without tools" reference in these marketing materials was erroneous; no fact witness testified to the contrary. Other than self-serving, conclusory testimony from MAG's own expert, Mr. Meyers, merely repeating the misprint, MAG never cites any testimony or other evidence showing ████████████████████████

████████████████████████████████████████████████

████████████████████████ A2585-86.[2]

MAG's suggestion (at 16-17) that the existence of the misprint itself creates a genuine issue of material fact as to whether the bowl can be removed manually is wrong. *See, e.g., Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 605-06 (7th Cir. 2000) ("misstatement or a typographical error" does not create a fact issue); *Jordan v. Columbia Cnty. Bd. of Educ.*, 492 F. App'x 956, 959 (11th Cir. 2012) (reasonable fact finders could draw no other inference than that the document "was a typographical error"); *Daub v. Eagle Test Sys., Inc.*, No. C-05-01055 RMW, 2006 WL 3782877, at *3 n.4 (N.D. Cal. Dec. 21, 2006) ("[A]n obvious typographical error does not create a genuine issue of material fact as to any of plaintiff's claims."); *M. Prusman Ltd. v. M/V Nathanel,* 684 F. Supp. 372, 374 (S.D.N.Y. 1988) (typographical error did not preclude summary judgment because other concurrent documents demonstrated the

---

[2] Even MAG witnesses acknowledge that marketing documents get the technical details wrong "many times." A5173 at 147:17-19.

Protective Order Material Removed

nature of the error). As the Supreme Court instructed, the evidence must be viewed in its overall context: "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott*, 550 U.S. at 380 (citation omitted).

The B/E toilet bowl cannot be disengaged without tools, and a misprint in a document does not change the actual operation of the product. Even Mr. Meyers, the expert MAG relies on, never tested MAG's counter-factual theory that B/E's bowl can be removed without tools, despite the opportunity to do so. When inspecting the B/E toilets, Mr. Meyers never turned (or attempted to turn) the fasteners on B/E's toilet bowl manually, without tools. A1969 at 191:6-11 ("Q: When you came to inspect the B/E toilet in California, you did not attempt to use your fingernail to disengage the toilet bowl, correct? A: That is correct. I thought there would be further opportunities to do that where it's possible to document it."). The B/E toilet was available for Mr. Meyers to inspect throughout the discovery process, at almost any time with 24-hour notice. A7636 at ¶ 2.[3]



Protective Order Material Removed

The isolated snippet of testimony from a former B/E employee, Paul Neary, also does not present any genuine dispute of fact. MAG unfairly characterizes an excerpt from Mr. Neary's deposition to suggest that the B/E toilet bowl can be removed with one's hands. █████████████████

████████████████████████████████ A1885 at 10:5-7.

As the district court noted in addressing this contention, MAG relies on a "somewhat rambling" sound bite from Mr. Neary's deposition, while ignoring other testimony from the same deposition, including testimony specifically clarifying the excerpt on which MAG relies. A15. The testimony as a whole does not provide a reasonable basis for the inference that MAG contends can be drawn. When "asked more directly" whether the bowl could be removed manually (A15), Mr. Neary clearly explained that a tool of some kind (*e.g.* a coin) is required ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

Protective Order Material Removed

██████████████████████████████████

████████████ ).

After considering Mr. Neary's testimony "as a whole," as required, the district court correctly concluded that "it is clear that he considered it necessary to use a coin to remove the toilet bowl." A15.[4] These are precisely the circumstances when summary judgment should be granted: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380; *see also*, *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993) ("[M]erely conclusory statements or completely insupportable, specious, or conflicting explanations or excuses will not suffice to raise a genuine issue of fact.").

Finally, the district court correctly rejected MAG's theory (at 13 & 18) that B/E's toilet bowls "can be removed manually," not only because that theory is unsupported but also because MAG did not disclose it during the discovery period. A16 ("[I]t is clear that Plaintiff did not explicitly contend that

---

[4] *See, e.g.*, *Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152, 1163 (10th Cir. 2002) (noting importance of viewing deposition testimony in full context and concluding that comments from one portion were clarified by comments in another portion and therefore did not raise a genuine issue of material fact); *see also Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) (witness "equivocations" do not create a triable issue of fact).

B/E toilets could be removed using a fingernail, but instead envisioned that removal 'without tools' could be accomplished through the use of a coin."). The district court's ruling on this procedural point is entitled to broad deference. *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005) ("[T]his court gives broad deference to the trial court's application of local procedural rules in view of the trial court's need to control the parties and flow of litigation before it.").

### B. There Is No Genuine Factual Dispute That A Coin Is A Tool When Used To Release The Fasteners And Remove The Bowl

MAG next suggests that using a coin to remove the B/E bowl could still qualify as a "toolless" removal under the '054 patent. First, the district court correctly construed the '054 patent's toollessly limitation to exclude the use of any tools. To the extent MAG argues that "tools" refers only to conventional mechanic's tools, MAG is wrong. The district court correctly rejected this argument.[5] Second, to the extent that MAG argues that whether a coin is a tool is a genuinely disputed question of fact, MAG is also wrong. A jury trial in

---

[5] MAG does not clearly state in its opening brief that it is challenging the correctness of the claim construction rulings in the district court's *Markman* order, as opposed to arguing that non-infringement should not have been resolved on summary judgment because of purported factual disputes. MAG should not be permitted to raise new arguments or challenges to the claim constructions in its reply brief. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").

federal court is not needed to determine that when a coin is used instead of a screwdriver to turn screws, the coin—like the screwdriver—is a tool.

The district court's claim construction correctly and unambiguously construed "toollessly" as meaning "without the use of any tools." A39; A41. MAG never explains how a procedure that is performed without the use of "*any* tools" really just means "without the use of only certain particular kinds of tools." MAG's position improperly tries to import limitations into the claims and rewrite the claim language to alter its scope.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quotations omitted). The presumption that claim terms are given their ordinary meaning can be overcome in only two circumstances: the patentee has expressly defined a term or has expressly disavowed the full scope of the claim in the specification or the prosecution history. *See, e.g., Phillips*, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term" or "an intentional disclaimer, or disavowal, of claim scope by the inventor"); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during

prosecution."). The standards for finding lexicography or disavowal are "exacting." *Thorner*, 669 F.3d at 1366.

To the extent MAG suggests that the district court should have given "tools" a special meaning, MAG never points to any definition or express disavowal that would justify revisiting the meaning of such a well-known word, let alone restricting "tools" to mean only "conventional mechanic's tools," whatever that might mean. MAG asserts (at 21) that the specification of the '054 patent "implicitly" describes types of tools in distinguishing a "toolless" removal. The specification does not in fact "implicitly" describe only certain types of tools; all tools are excluded. In any event, an "implicit" suggestion in a patent specification is insufficient to constitute a special definition or disavowal. *Thorner*, 669 F.3d at 1365 (patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to redefine the term"). Likewise, disavowal requires that "the specification [or prosecution history] make[ ] clear that the invention does not include a particular feature, or is clearly limited to a particular form of the invention." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001).

There is absolutely no suggestion—implicit or otherwise—anywhere in the intrinsic record that only *some* tools are excluded. MAG points to nothing that redefines "toollessly" to exclude operations with certain kinds of tools

while permitting the use of other kinds of tools. As the district court correctly summarized in its *Markman* order, "the claims and specification never describe the types of tools that could or could not be used to remove or install the toilet, nor does the patent make any reference to mechanics." A39. The district court further correctly explained that nothing in the specification language that MAG cited "suggests that the repairs may occur with the use of unconventional mechanics' tools, conventional non-mechanics' tools, or indeed any tools at all." A38. The specification makes it clear that *all* tools are excluded, without exception. A149 (4:7-8) ("the tabs 39 may be manipulated manually, and therefore no tools are required"); A149 (4:37-38) ("The bowl replacement process . . . does not require the use of any tools."). When MAG argued at the summary judgment hearing that a coin was not a tool, notwithstanding the court's claim construction, the district court explained directly that "I think I, in that [*Markman*] order, implicitly but clearly rejected the argument that you are making here today that a coin is not a tool." A7942 at 25:22-24.

MAG is also incorrect in arguing that whether a coin is a tool for purposes of the '054 patent presents a fact issue. The district court correctly resolved this issue on claim construction. As the Federal Circuit recently explained on remand in *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc. Momenta Pharmaceuticals, Inc.*, __ F.3d __, Nos. 2012-1567, 2012-1568, 2012-1569, 2012-1570, 2015 WL 3772402, at *5 (Fed. Cir. June 18, 2015),

both "[t]he internal coherence and context assessment of the patent" and "[t]he meaning one of skill in the art would attribute to [a term] in light of its use in the claims" are questions of law. *Id.* MAG's argument (at 23) that its own expert Mr. Meyers opined that he had not heard of a coin being used as a tool is of no moment. Just as in *Teva*, MAG cannot transform these legal questions of claim scope into purported factual disputes "simply by having an expert offer an opinion on it." *Id.*

In any event, even on the facts, there can be no material dispute that a coin is a tool. Everyone agrees that a screwdriver used to turn the B/E fasteners is a tool. *See, e.g.,* A1963-64 at 168:25-169:6. A coin in this context takes the place of the screwdriver. When a coin is used as an implement to replace a screwdriver—an admitted tool—the coin is itself a tool. Any other conclusion defies common sense.[6]

---

[6] MAG (at 25) does not fairly describe the record in an attempt to dispute that coins are considered tools in the commercial aviation context. Commercial airline service manuals, for example from Boeing, instruct mechanics to use a coin as a tool to perform "tap tests" on vacuum toilet systems. A2659-60. The witnesses who MAG identified actually testified that using a coin as a tool is a common occurrence. *See, e.g.,* A8157 at 255:19-20 ("I think I've used a coin as a tool many times for different things.").

B/E's toilet bowls do not contain a receptacle that is removed "toollessly." A screwdriver or equivalent tool[7] is necessarily used. B/E does not and cannot infringe any asserted claim of the '054 patent. The district court's summary judgment ruling should be affirmed.

## III.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF NO INFRINGEMENT OF THE '055 PATENT

The '055 patent is directed to a "method of servicing a modular vacuum toilet" having a particular configuration in which certain components are combined into a single module to facilitate replacement of a "line replaceable unit" in the field. A251 (claim 15). In particular, claim 15 requires that "at least two of the discharge valve, rinse fluid valve, and flush control unit are provided as a valve set forming a second line replaceable unit" and "replacing the second line replaceable unit with a new second line replaceable unit independently of the toilet." A251 (claim 15). To establish infringement of the asserted claims (15-16, 20-21, and 24-26), MAG therefore had to show, among other things, that the B/E toilet has (1) the claimed "valve set" (2) forming a "line replaceable unit." A251. The district court construed "line replaceable unit" to mean a "single module targeted for easy replacement in the field," A41, a construction MAG does not dispute on appeal. Because the undisputed

---

[7] Even a cursory internet search reveals advertisements for "coin-sized" pocket screwdrivers. http://lifehacker.com/319960/coin-sized-pocket-screwdrivers.

Protective Order Material Removed

facts confirm that "a 'line replaceable unit' as recited by the claims of the '055 patent is not present" in B/E's toilets, the district court correctly granted summary judgment of no infringement. A23.

The judgment also can be affirmed on two alternative, and independent, grounds: (1) B/E's flush valve and ISC do not constitute the claimed "valve set," and (2) MAG offered no evidence that the claimed method has ever been performed in the field, *i.e.* on an aircraft in this context. *AquaTex Indus. Inc., v. Techniche Sols.*, 479 F.3d 1320, 1238 (Fed. Cir. 2007) (court reviews a grant of summary judgment *de novo* and may affirm on any ground supported by the record).

### A.   B/E's Flush Valve And ISC Do Not Constitute A "Single Module Targeted For Easy Replacement In The Field"

MAG's infringement claims on the '055 patent are fundamentally deficient because the accused B/E toilets do not include a valve set forming the required "line replaceable unit." Rather than point to a "single module targeted for easy replacement in the field," MAG incorrectly relies on separate components that are maintained separately.

MAG's theory on the "line replaceable unit" element centered around two components, namely (1) a flush valve and (2) an ISC. █████████
████████████████████████████████████████████████
████████████████████████████████████████████████

A1957 at 146:15-20 █████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████

        ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ A2638-47; A1957 at

146:15-20; A3163 ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████ ████████

        ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ A2641-2 ████████████████████████████████████

Protective Order Material Removed

A2640

MAG cannot point to any evidence that the flush valve and ISC are a module "targeted for easy replacement in the field."

A1741.

Highlighting the fact that the flush valve and ISC are not an "LRU," MAG never pointed to any evidence that any of B/E's customers ever removed and replaced these two components together. A23; A3165; A1957-62 at 146:15-20, 148:6-11, 153:1-5, 155:4-156:7, 164:4-7, 164:13-16. MAG's expert admitted the point, conceding there is no evidence that B/E provided these parts together or that any of B/E's customers ever actually replaced these two components together in the field. A1957-62.

Protective Order Material Removed

Rather than present evidence that the claimed method was actually performed, MAG relies (at 29) on screen shots from a B/E product demonstration video. █████████████████████████████████

███████████████████████████████████████████████████████

████████████ MAG offers no evidence to suggest that the video is directed to replacing faulty flush valves or ISCs on the aircraft, either alone or in combination. Indeed, MAG offers no evidence of a mechanic entering a plane and *targeting* specific components for repair and replacing a single module *in the field*. ███████████████████████████████████

███████████████████████████████████████████████████████

████████████████████ A251 (11:34-39) ("replacing . . . the second line replaceable unit with a new second line replaceable unit independently of the toilet"). The district court was right to conclude that "A disassembly video of an entire toilet which does not appear to explicitly refer to the flush valve or suggest replacement of the flush valve is not sufficient to create a genuine issue of disputed material fact." A23.

MAG also incorrectly argues that the district court failed to apply its claim construction in evaluating whether B/E's toilets meet the line replaceable unit element. MAG contends (at 32-33) that the district court applied "an entirely new set of criteria," such as whether the flush valve and control unit had "separate part numbers" or were accompanied by a manual with "step-by-

step explanations for replacing the LRU." MAG's argument is frivolous. The district court did not add any "part number" or "instruction manual" requirements to the claims. Rather, the district court correctly looked for indicia in the evidence from which it could be inferred that the flush valve and flush control unit were a single module targeted for easy replacement in the field. Given that there was no such evidence, the district court correctly held—as a matter of non-infringement, not claim construction—that the claim element was not met and that B/E did not infringe as a matter of law.

### B. B/E's Flush Valve And Flush Control Unit Do Not Constitute A "Valve Set"

The judgment of no infringement also may be affirmed on the alternative ground that B/E's toilets lack a "valve set." The claims have two separate, albeit related, requirements: (1) a valve set that includes certain components together, and (2) that the valve set is maintained and serviced as an LRU. How the components are packaged together may make them a "valve set" and, separately, how that set is maintained and serviced may make it an "LRU." As explained above, the district court correctly found that the alleged valve set is not an LRU, because it is not a single module targeted for easy replacement in the field. But in addition, B/E's flush valve and ISC do not form a "valve set" as required by the claims.

In the "Background of the Invention," the specification of the '055 patent explains some of the difficulties in repairing and maintaining vacuum toilets. One is that "separate components used in conventional vacuum toilets make repair and maintenance overly time consuming and labor intensive." A246 (1:39-41). The components also "are often located in areas which are difficult to access." *Id*. (2:3-5). As a result, maintenance often involves removing and replacing the entire toilet, requiring that a "number of toilets must be kept in stock for replacement in the event of a faulty toilet." *Id*. (2:37-39). The patent sought to address the need "for a vacuum toilet that is easier to maintain and which reduces the number of stock parts required." *Id*. (2:50-51).

One of the ways that the '055 patent taught to improve servicing vacuum toilets on aircraft and reduce the number of stock parts was to combine components into a "valve set" that would form a "line replaceable unit." The specification describes the combined components expressly: "it will be appreciated that the valve set 8 *of the present invention* incorporates all of the valve and control apparatus. The rinse valve 72, FCU 74, and actuator 76 are all mounted to the discharge valve 70 to create an LRU." A250 (9:46-50) (emphasis added). The configuration is depicted in figure 4, A241 (annotations added):



"With the above construction, the valve set 8 is quickly and easily removed."

A250 (9:32-33). During prosecution, the applicants explicitly distinguished the

unitary valve set structure of the alleged invention from a configuration in

which the components were "separately and independently mounted." A2578-

79; A1849-51. "[W]here the patentee has unequivocally disavowed a certain

meaning to obtain his patent, the doctrine of prosecution disclaimer attaches

and narrows the ordinary meaning of the claim congruent with the scope of the

surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir.

2003).

     The flush valve and flush control unit in the B/E toilets do not constitute

the required "valve set." The record is uncontroverted that (1) the flush valve

and ISC are separate parts, each with its own part number, A23; A3163;

A2639-47; A1957 at 146:15-20; (2) there is no evidence that B/E ever offered

these separate parts for sale as a set, *id.*; (3) ███████████████████████

Protective Order Material Removed

████████████████████████████████████████████████

████████████████████ A23; A3164; A2149-50; and (4) there is no evidence that any customers have ever replaced both of these two components together, A23; A3165; A1957-62 at 146:15-20, 148:6-11, 153:1-5, 155:4-156:7, 164:4-7, 164:13-16.

MAG contends that the flush valve and flush control unit are a "valve set" because they are separately bolted into one back plate that is part of the rear support structure of the toilet. MAG is wrong. The photograph below shows the separate components:



A1712. As shown, the separate flush valve and ISC components are not a "set" but are each "separately and independently mounted" to the rear support structure, a configuration disclaimed during prosecution. A2578-79; A1849-51.

Not only can each component on the B/E toilet be replaced independently of the other, the instructions *require* them to be replaced independently. A2641-42 ████████████████████████████████████████████████ ██████████████████████████████████ This forecloses MAG's claim for infringement, and the Court can affirm the district court's judgment on this alternative and independent basis. Simply put, the word "set" in the claims must mean something, and no reasonable jury can find that B/E's separate components are a "set".

### C. MAG Has No Evidence That B/E's Flush Valve And Flush Control Unit Have Ever Been Removed On Aircraft ("In The Field")

Another alternative and independent ground to sustain the judgment is that MAG has not introduced evidence that the claimed method has been performed on an aircraft (that is, "in the field"). *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) ("A method patent claims a number of steps; under this Court's case law, the patent is not infringed unless all the steps are carried out.")

The '055 patent discloses and claims a method for servicing a modular vacuum toilet where the toilet is installed. A246 (1:58-67) (distinguishing the prior art that removed "an entire toilet assembly from the aircraft."). The requirement that the servicing must occur on the aircraft is evident from the structure of the claim language. To begin with, the patent and the claims are all

about replacing LRUs, which are modules targeted for replacement "in the field." To suggest that these claims actually cover replacing modules *not* in the field, but instead in the shop as has been done for time immemorial, makes no sense and completely changes the understood definition of what a *line-replaceable* unit is. MAG's noninfringement expert agreed, stating: "If you were to take that toilet off the aircraft into a repair shop, as the claims are currently construed, that part would not be an LRU." A1953.

Further, the claims state that for the "method of servicing the toilet," the toilet is "in fluid communication" with the plumbing on the aircraft. A251 (11:20-23); *id*. (11:21-22) (*e.g.,* "an outlet in fluid communication with a sewer line"); *see also* A2582-83, A2618-25; A2633-35. Repairs made in an offsite repair shop are necessarily outside the claims because the toilet is not in fluid communication with the aircraft plumbing. Further, the claims require that the LRUs are replaced "independently of the toilet." A251 (11:35-40). If the entire toilet is taken off the aircraft for service in the shop, and then replaced back on the aircraft, then the LRU cannot be said to be replaced "independently of the toilet"—the toilet has been uninstalled.

The Patent Trial and Appeals Board reached this same conclusion regarding the scope of the claims in *inter partes* review proceedings in the

United States Patent and Trademark Office.[8] Even under the "broadest reasonable interpretation," the Board explained that the claims do not reach activity that occurs at a location different from where the toilet is installed, *e.g.*, in a repair shop. A8168, A8215. The Patent Office explained that "an LRU is *line replaceable* in that it is removed and replaced ***at the line*** (where it is installed) rather than removing the entire toilet and removing and replacing the LRU on the bench (*e.g.*, a shop containing a bench or a location other than where the toilet was installed)." A8168 at 9 (emphasis added); A8215 at 9. MAG's litigation experts agree. *See* A7656 at 50:1-3 (MAG validity expert stating that "'[i]n the field' would be an airplane at the gate, at a turn, or an airplane being readied to be delivered to the gate."); A7660-61 at 73:24-74:6 (MAG expert testifying that "in the field" means "on-wing" and does not include maintenance in the hangar).

It is not a mystery why MAG tries to stretch the claims to cover maintenance in the shop: MAG presented no evidence that B/E or its customers

---

[8] Pursuant to Federal Rule of Evidence 201, B/E requests that the Federal Circuit take judicial notice of the PTO's claim constructions in the institution decisions from IPR2014-01510, and IPR2014-01513, Paper 24 in each proceeding. Judicial notice may be taken "at any stage of the proceeding" including on appeal. *See, e.g.,* Fed. R. Evid. 201(d); *In Re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 205-06 (3d Cir. 1995). The PTO's claim constructions are publicly available and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), for example from the Patent Office website at https://ptabtrials.uspto.gov/. *See* A8202-30 and A8160-85.

ever performed the claimed methods on aircraft. When asked directly, MAG's

expert admitted that there is no such evidence:

> Q: Okay. Have you seen any evidence anywhere in this case that anybody removed the flush control unit or the flush valve or any combination of the two from a B/E toilet on an aircraft?
>
> A: As I have said in my report, the discovery is ongoing, but up to this point I have not.

A1958 at148:6-11.

> Q: And in all of your review to date, you are not aware of a single instance where a mechanic changed a flush valve and an ISC on the aircraft, correct?
>
> A: Correct.

A1962 at 164:13-16.

The lack of evidence that the claimed method of the '055 patent was

performed is a further ground to affirm the judgment of no infringement.

## IV. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF NO INFRINGEMENT OF THE '942 PATENT

The '942 patent is directed to a particular configuration of a modular

toilet with a "frame support structure" having an "opening" in which a

"removable bowl" is inserted. A55 (10:10-15) (claim 1). The bowl must

include an "out-turned flange supported by the top of the support structure,"

which the district court construed to mean "an outside rim or edge turned away

from the sidewall, transferring loads to the top of the support structure." A34.

Although the "out-turned flange" element was expressly added during

prosecution to overcome prior art (A119, A124), MAG improperly tried in litigation to stretch the patent to cover B/E toilets specifically designed without the claimed flange. Based on the uncontroverted record, the district court correctly rejected MAG's reliance on vertical columns or "ribs" on the side of the toilet bowl to satisfy the "flange" element. MAG's arguments challenging this decision are without merit.

### A.   The District Court Correctly Construed "Flange" To Be "An Outside Rim Or Edge Turned Away From The Sidewall," Which Does Not Include "Ribs"

MAG's brief on appeal articulates no objection to the district court's claim construction that the claimed "out-turned flange" is "an outside rim or edge turned away from the sidewall, transferring loads to the top of the support structure." Indeed, MAG's own proposed construction during *Markman* specifically included the "rim" and "edge" language. A29. MAG does not ask this Court to revisit this aspect of the construction.

Neither does MAG directly challenge the district court's rejection at claim construction of MAG's contention that the flange could also include "ribs." Specifically, MAG sought a construction of flange that included a "rim, edge, *or rib*" in order to make out an infringement case against B/E. A29 (emphasis added). The district court correctly rejected MAG's effort to expand the reach of the claims, holding explicitly that "a person of ordinary skill in the art would understand 'flange' to include rims and edges, but not ribs." A33.

The district court's construction tracks both the intrinsic and extrinsic evidence. The patent specification in all instances consistently describes and depicts the claimed "flange" as a rim or edge turned away from the sidewall of the toilet bowl. This arrangement is depicted in Figures 1A and 1B, in which item 40 shows the flange, the rim on the outside of the toilet bowl, turned away from the sidewall and overlying the toilet frame. A43-44. The flange also is depicted in Figure 3 (but not labeled with a number), which shows the flange as the outside rim of the bowl (just beneath the number 29) sitting on the toilet frame. A45. The specification explains that the purpose of the flange arrangement is so "the bowl is not a load-bearing component, and may be made of non-structural materials" such as light plastics or thin-walled metals. A53 (5:4-10) (out-turned flange "closely overlies the frame top member so that the downward forces applied to the bowl 36 are transferred to the frame 20. As a result, the bowl 36 is not a load-bearing component, and may be made of non-structural materials . . ."). The use of a load-bearing bowl with vertical columns or "ribs" instead of a flange is a different configuration that is never described or suggested in the patent and is contrary to the disclosure.

The flange element was critical to MAG's ability to obtain the patent. MAG specifically added the requirement of an "out-turned flange supported by the top of the support structure" during prosecution. A124. The use of this specific type of support, an out-turned flange, was how MAG distinguished the

prior art Tyler patent, in which the bowl was a load-bearing component sitting inside the frame. A119, A127.

The district court's conclusion that "ribs" are not within the scope of the '942 patent claims also is consistent with the extrinsic evidence. The district court considered how a person of ordinary skill in the art would consider the term in light of definitions of "flange" in aviation dictionaries as well as non-technical dictionaries. After finding that "rim" or "edge" predominated in the definitions, and only "a single non-technical dictionary" referred to a rib, the district court held that a person of ordinary skill in the art would understand the claim term flange to include rims and edges, but not ribs. A33.

The district court's finding that "flange" in the '942 patent would not be understood to include ribs is a factual finding underlying the court's claim construction and is reviewed for clear error. *Teva*, 135 S.Ct. at 842 ("review for clear error those factual findings that underlie a district court's claim construction"); *Cephalon, Inc. v. Abraxis Bioscience, LLC*, __ Fed. App'x __, Nos. 2014-1411, 2014-1442, 2015 WL 3756870, at *2 (Fed. Cir. June 17, 2015) ("how the relevant scientific community understands [claim terms] is therefore a question of fact reviewable for clear error"). MAG does not even address the correct standard, let alone explain how the district court's finding was clear error.

To the extent that MAG suggests in reply that the district court's decision is clearly erroneous because the extrinsic evidence was not uniform, this Court in *Cephalon* rejected exactly such an argument in affirming a claim construction: "To the extent [the patent owner] is arguing the district court committed legal error by basing its construction on an understanding that was less than universally accepted, a definition need not be universally accepted to form a proper basis for claim construction." *Id*. at *2.

MAG's argument in the district court that the claimed flange could include a rib or "columnar structures along the sidewall" (at 35 n.1) was properly rejected because it is tantamount to an argument that the claimed "out-turned flange" could encompass ***any*** support structure on the side of the bowl. It does not—the claims are specifically directed to an "out-turned flange" that is "supported by the top of the support structure." If MAG's claims were intended to cover any kind of support structure, the patent should have used different, broader, words. (Indeed, the claims already use the words "support structure" in describing the frame.) MAG instead distinguished the prior art and directed its disclosure and claims to something particular and different: an "out-turned flange." A56. MAG cannot now ignore that it claimed a "flange" and strip this claim element of meaning. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 353 U.S. 722, 740 (2002) (holding that a narrowing amendment during prosecution to overcome prior art rejection creates a

presumption "that the patentee surrendered all subject matter between the broader and the narrower language").

### B.     There Is No Genuine Issue Of Fact That B/E's Toilets Lack The Required "Out-Turned Flange"

MAG contends (at 44) that there is a genuine fact dispute whether the ribs on the B/E toilet bowl literally meet the required "out-turned flange" element.[9] MAG argues (at 45) that the ribs themselves should be seen as containing two purported "edges" that are "flanges": 1) the bottom of the entire rib and 2) the bottom of a small groove cut into the lower portion of the rib. MAG refers to these as the "first surface" and "second surface," respectively. The district court correctly rejected MAG's argument, holding that "a surface that is a 'rib' cannot literally constitute a flange" in light of the claim construction and the undisputed facts. A20. MAG's contention is depicted below.

---

[9] MAG no longer alleges infringement under the doctrine of equivalents. MAG specifically added the "out-turned flange" element during prosecution to overcome a prior art rejection. A119, A124. As such, the district court found that prosecution history estoppel precludes MAG from arguing that the flange element is met under the doctrine of equivalents. A21. MAG does not challenge this holding in its opening brief on appeal. The doctrine of equivalents, therefore, is no longer at issue. *SmithKline,* 439 F.3d at 1319 ("Our law is well established that arguments not raised in the opening brief are waived.").

Protective Order Material Removed



### 1. MAG's Alleged "First Surface" Cannot Meet The Claims At Least Because It Does Not Transfer Loads To The Top Of The Support Structure

The '942 patent claims all require that the "out-turned flange" must be "supported by the top of the support structure." The district court construed this portion of the claim to require "transferring loads to the top of the support structure." A41. MAG does not contest this aspect of the court's construction. Therefore, in addition to having to show a flange, MAG must show that the flange transfers loads to the *top* of the support structure. MAG did not and cannot make such a showing. To begin with, a "base of vertical columns on the sidewall of B/E's toilet bowl (B/E's 'ribs')," as MAG calls the first surface, is just the bottom of the ribs and not a flange. In any event, this "surface" does not contact the top of the support structure and therefore cannot satisfy the claim.

Protective Order Material Removed

B/E's toilet contains a gap of approximately 1/8th of an inch between the rib and the frame. A7966-67 at 49:10-50:14; A7777-78; A2211; A1989-90 at 177:14-178:22.



This gap is a fundamental attribute of the product. Because the bottom of the ribs do not touch the top of the support structure, this surface does not transfer loads to the top of the structure. MAG's expert agreed. A1974 at 206:22-25 ("Q: If it's not in contact with each other, there's no transfer of load? A: That is correct."). The district court thus correctly held that MAG's alleged "first surface" cannot meet the claim because it does not actually contact the frame and transfer loads to it. A20.

On appeal, MAG avoids talking about the actual product and instead argues (at 49-51), as it did in the district court, that certain B/E computer-aided

design (CAD) drawings should raise an issue of fact because they do not show the gap. The district court correctly found the CAD drawings not probative of infringement because there is no "evidence that the CAD drawing was actually produced as a real product." A20. MAG makes the bald assertion (at 51) that the CAD drawing "depicts B/E's toilet as it was manufactured and sold," but never offered any evidence in support. All of the probative evidence is to the contrary and confirms the existence of the gap, including testimony from B/E's engineers confirming that the CAD drawings depicted an early conceptual design that was never actually implemented, and the B/E toilet itself (brought to the summary judgment hearing) which plainly shows a gap of approximately $1/8^{th}$ of an inch between MAG's alleged "first edge" and the frame. A2822-28; *see also* A7777-78; A7966-67 at 49:10-50:14.

MAG tries to bolster its inadequate proof with the testimony of its expert, Mr. Meyers. But he cannot raise a fact issue for trial either. Mr. Meyers never opined that the actual B/E product lacks the gap; nor could he, because the actual B/E product plainly has that gap. Instead, Mr. Meyers relied entirely on the CAD drawings described above, documents that are immaterial because they do not depict an actual product. MAG's unsupported assertions cannot change the actual product and create a dispute that somehow avoids summary judgment. *Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1051 (Fed. Cir. 2001) ("If all expert opinions on infringement or noninfringement were

accepted without inquiry into their factual basis, summary judgment would disappear from patent litigation.").

MAG next incorrectly argues that a fact issue exists on account of a finite element analysis (FEA) simulation its expert offered in an attempt to show load transfer at the bottom of the rib. The FEA simulation also was not probative of infringement. In presenting this evidence on appeal and criticizing the district court, MAG badly misrepresents the district court's summary judgment order. Purporting to quote from the district court's order, MAG writes, (at 53): "Curiously, the district court agreed that '[MAG's] simulation clearly shows that load transfer occurs *at both surfaces* [the 'first' and 'second' edges],' but then found the simulation irrelevant, because it simulated 500 pounds of force." Not quite. The district court actually wrote:

> Plaintiff's expert cites a finite element analysis simulation showing load transfer *around the two surfaces*. While this simulation clearly shows that load transfer occurs *in the area of the two surfaces, the simulation* <u>*does not show*</u> *whether load is transferred on both surfaces or only on the second surface.*

A20 (emphasis added). The district court did not find that load was in fact transferred at the first surface, as MAG incorrectly states. To the contrary, even viewing the simulation in the light most favorable to MAG, the district court explained that the simulation "did not show" the claimed load transfer as MAG asserted. Plus, the district court was correct to conclude that this counter-

factual simulation, with an entirely unrealistic load assumption, does not create a *material* factual dispute. *Id*. ("[T]he simulation assumed that a force of 500 pounds was placed on the toilet bowl, significantly more force than would be encountered in a real-world situation.").

In any event, a purported finite element analysis done for the purposes of litigation cannot change the actual structure of the product: the bottom of the ribs on the B/E bowl do not touch the frame, and therefore they cannot transfer load to the frame. MAG's expert agrees. A1974 at 206:22-25 ("Q: If it's not in contact with each other, there's no transfer of load? A: That is correct."). This ends the inquiry.

MAG's "bottom of the rib" theory also can be rejected for the further reason that the bottom of the rib never touches the "top" of the toilet frame, as required by the claim. In other words, MAG's alleged "first surface" cannot meet the "flange" element of the '942 patent "because the first surface is below the second surface, [so] it would touch an intermediate point on the support structure."[10] A20. This conclusion is apparent based on a visual inspection of B/E's product and is depicted below in annotated figures.

---

[10] MAG argues (at 43) that the court imported a "uniform elevation" requirement into the term "top." MAG then concludes that a lower portion of the rib allegedly contacting the intermediate portion of the frame nonetheless meets the "top of the frame" claim element. This argument is nonsensical. The Court did not in any way alter the plain meaning of the word "top," and never used the phrase "uniform elevation" in its order. The district court was simply

Protective Order Material Removed



The district court correctly held that the bottom of the rib, MAG's alleged "first surface," cannot rest on the top of the support structure as required by the claim language. A20.

### 2. MAG's Alleged "Second Surface" Is Not A "Flange" That Transfers Loads To The Top Of The Support Structure

MAG next argues (at 45) that it presented a viable infringement theory because the ribs on the B/E toilet have "a groove machined into these vertical columns." MAG's argument that this groove, or slot in the rib, is a "second

---

comparing the claims to the accused product. MAG's argument eliminates the plain meaning of "top," so that contact with any part of the frame somewhere in the general vicinity of the upper part of the frame would suffice. The district court rejected this argument, correctly, and no reasonable jury would find that a position below the top is actually the top.

edge" that could satisfy the flange element is without merit. The district court correctly held that this slot, which is simply where the bottom of the rib contacts the frame, cannot be the required "flange."

MAG's argument on this point seeks to eviscerate the meaning of "flange." The district court correctly confirmed that the claimed flange did not include a rib. A flange is a particular kind of structure, not any point of contact between a rib and the frame. The fact that the rib has a groove that defines a bottom of the rib does not transform the rib into a flange. If MAG's argument were accepted, any point of contact between any structure on the side of the bowl and the frame would become a flange for purposes of the patent just because there is contact between these two components. Because the claim does not cover supporting the bowl with ribs, it follows that the precise point of support—the bottom of the rib—is also not covered. To hold otherwise would vitiate this claim limitation. There is nothing added to the B/E rib at the point of support to transform the rib into a flange—MAG is simply pointing to the rib itself and nothing else. This is not covered by the patent as a matter of law, and the district court was correct to enter summary judgment.

## C.    The District Court Did Not Apply A Revised Construction

MAG also makes the misguided contention (at 37-43) that the district court revised its construction of "flange" in analyzing the "second surface." MAG contends that the district court applied a new construction of "out-turned

flange" as a "flat horizontal piece sticking out" rather than applying its construction of "an outside rim or edge turned away from the sidewall, transferring loads to the top of the support structure." The district court did not revise its construction or apply a new one.

The district court applied the construction of "out-turned flange" from its *Markman* order. The district court described MAG's alleged second surface as a slot within "cylindrical columns" or "ribs" extending vertically. A20. The district court then contrasted these structures with the required flange, construed as an outside "edge" or "rim" as described above. The district court also explained how the B/E toilets do not have a "flat horizontal piece sticking out" but that "the entire set of ribs rests on the support structure." A20. This is an entirely accurate characterization of the B/E product that the district court was pointing to as part of its infringement analysis, and does not in any way reach a new construction. In other words, the district court observed that there is nothing added to the B/E rib at the point of support to transform the rib into a flange.

The district court's summary judgments of non-infringement should be affirmed.

## B/E AEROSPACE'S CROSS APPEAL

## I.    INTRODUCTION

B/E is not aware of any cases involving similar facts in which assignor estoppel was applied. B/E began to develop its vacuum toilet before having any association with one named inventor, Mr. Mark Pondelick. A2962-65. After the design work began, B/E hired Mr. Pondelick as a consultant. *Id.* Mr. Pondelick subsequently became an employee of B/E with a negligible stock holding in the company (less than one one-thousandth of one percent). *See id.*; A2971. Rather than leverage Mr. Pondelick's knowledge to set B/E on a course of infringing the MAG patents, Mr. Pondelick became a part of the B/E team that worked with experienced and independent patent counsel at the law firm of Drinker, Biddle and Reath ("DBR") to ensure that B/E's vacuum toilet does ***not*** read on any existing patent claims, including those held by MAG. *See* A2967-70.

Yet when it came time to weigh the equities, the district court held that "Defendant's efforts to avoid infringement are not relevant to whether Mr. Pondelick and Defendant are in privity." A9. This conclusion is incorrect. The district court also reviewed various privity "factors" in a way that did not consider the full equities. *See* A9-A12. Had all the equities been properly balanced, assignor estoppel should not have been applied to B/E.

## II.    THE DISTRICT COURT INCORRECTLY APPLIED ASSIGNOR ESTOPPEL TO BAR B/E'S INVALIDITY DEFENSE

### A.    Standard Of Review For Assignor Estoppel

The Federal Circuit reviews the issue of assignor estoppel under an abuse of discretion standard. *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 424 F.3d 1161, 1165 (Fed. Cir. 2005). "An appellate court, however, may set aside a discretionary decision if the decision rests on an erroneous interpretation of the law or on clearly erroneous factual underpinnings." *A.C. Aukerman Co. v. R.L. Chairdes Constr. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992). Moreover, "[i]f the decision on [an equitable issue such as assignor estoppel] is made on summary judgment, there must, in addition, be no genuine issues of material fact, the burden of proof of an issue must be correctly allocated, *and all pertinent factors must be considered.*" *Id.* (emphasis added).

### B.    Assignor Estoppel Should Be Applied Only To Prevent Unfairness And Injustice

Assignor estoppel is an equitable doctrine that is designed to "prevent unfairness and injustice." *Diamond Sci. Co. v. Ambico, Inc.,* 848 F.2d 1220, 1224 (Fed. Cir. 1988). When it is fair and just to do so, the doctrine prohibits an assignor of a patent, or one in privity with an assignor, from attacking the validity of that patent when he or she is sued for infringement by the assignee. *Id.*

The doctrine's primary focus is on the "unfairness and injustice that would be suffered by [the patent owner] if the [accused infringer] were allowed to raise defenses of patent invalidity." *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988). The analysis "must be concerned mainly with the balance of equities between the parties." *Id.* at 1225. Application of assignor estoppel indeed "*requires* a balancing of the equities of the case." *Q.G. Prods., Inc. v. Shorty, Inc.*, 992 F.2d 1211, 1213 (Fed. Cir. 1993) (emphasis added).

The doctrine of assignor estoppel may extend to those in privity with the assignor in proper circumstances. *Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990). The decision on whether to extend assignor estoppel to persons other than the inventor requires careful consideration. "Privity, like the doctrine of assignor estoppel itself, is determined upon a balance of the equities." *Id.* "If an inventor assigns his invention to his employer company A and leaves to join company B, whether company B is in privity and thus bound by the doctrine will *depend on the equities dictated by the relationship between the inventor and company B <u>in light of the act of infringement</u>*. The closer that relationship, the more the equities will favor applying the doctrine to company B." *Id.* (emphasis added).

This Court's "privity" precedents, including *Shamrock*, all "involve very close financial relationships in which the actual assignor almost envelopes the

other entity." *Earth Res., Corp. v. U.S.*, 44 Fed. Cl. 274, 286 (1999). For example, in *Shamrock*, the inventor owned 50,000 shares and after he joined, the company changed its business focus to build facilities for using the patented technology. *Shamrock*, 903 F.2d at 794. The inventor oversaw the design and construction of those facilities. *Id.* The inventor in *Shamrock* also made the decision to use the patented technology jointly with the company and was in charge of company's infringing operations. *Id*. In *Intel Corp. v. United States ITC,* 946 F.2d 821, 839 (Fed. Cir. 1991), the company was in privity with a named inventor who founded the company that sponsored a joint venture to commercialize the infringing products, remained a major shareholder who personally indemnified the company against infringement, served as the chief executive officer and personally selected the factory that produced the infringing product. In *Mentor Graphics Corp. v. Quickturn Design Systems, Inc.*, 150 F.3d 1374 (Fed. Cir. 1998), the company was held to be in privity with a parent that owned all of the company's stock and where the relationship between parent and company had been formed "precisely" so that company could conduct infringing activities. This case involves nothing comparable.

**C.    This Court's *Shamrock* "Factors" Do Not Warrant A Finding Of Privity For Purposes Of Assignor Estoppel**

The district court reached its decision after reviewing various "factors" taken from this Court's decision in *Shamrock*. *See* A9-12. The district court's analysis failed to balance all of the relevant equities. The district court's decision to block B/E's invalidity defense did not avoid unfairness and injustice to MAG but, instead, resulted in unfairness and injustice to B/E. Applying assignor estoppel to B/E would be an unwarranted expansion of this Court's precedent.

Mr. Pondelick joined B/E *after* the decision to develop the accused toilet was made. *See* A2962-65; *compare Shamrock*, 903 F.2d at 794 ("the decision to begin processing PTFE with radiation was made jointly by Luniewski and the president of MSI"). B/E had already selected a facility for designing its vacuum toilet before it retained Mr. Pondelick. *Id.*; *compare Shamrock*, 903 F.2d at 794 ("as soon as Luniewski was hired in 1983, MSI built facilities for processing PTFE with radiation" and "Luniewski oversaw the design and construction of those facilities."). Mr. Pondelick was not hired to start up B/E's vacuum toilet operations, and when he joined B/E he was one of a number of engineers who worked on the design. A2967; *compare Shamrock*, 903 F.2d at 794 ("Luniewski was hired in part to start up MSI's infringing operations" and "Luniewski was in charge of MSI's PTFE operation."). Indeed, Mr. Pondelick

Protective Order Material Removed

joined B/E after critical design decisions had been made, and spent his first few months at B/E working only limited hours as a "consultant." A2963; A2966-67.; *compare Shamrock*, 903 F.2d at 794 ("Luniewski left Shamrock to join MSI as Vice–President in charge of Operations.").

Significantly, neither Mr. Pondelick nor anyone at B/E set out on a course to conduct infringing activities. Indeed, the course of conduct was specifically to *avoid* infringement—a path that was successful as the undisputed facts and the district court's judgment of no infringement confirmed. The team of B/E engineers, which included Mr. Pondelick, collaborated with DBR, an independent law firm, over a period of many months, examining the claims of the MAG patents-in-suit and many other patents, and refining the design of the B/E toilet over several iterations to ensure that B/E avoided those claims. *See* A2968-70. B/E followed the advice given by DBR. *Id.* After this design-around process, DBR opined that the B/E toilet did not infringe the patents-in-suit before B/E began producing its commercial product. *Id.*; *see also* A2973-74.

Nor is this a case where Mr. Pondelick is akin to a company founder or significant stakeholder in the enterprise asserting an invalidity defense. Indeed, Mr. Pondelick has a negligible financial interest in B/E. Mr. Pondelick owns approximately ██████████████████████████ ████████ of B/E's outstanding stock of over 100 million shares. A2971;

Protective Order Material Removed

*compare Shamrock*, 903 F.2d at 794 ("Luniewski own[ed] 50,000 shares of MSI stock" and was "Vice–President in charge of Operations"). Mr. Pondelick was not involved in B/E's founding, which occurred in 1987, over two decades before Mr. Pondelick joined. A2961; A2963; *compare Intel*, 946 F.2d at 839 (company founder). Further, B/E is not a small company where Mr. Pondelick exerts outsized influence; B/E has over 10,000 employees. A2961. Mr. Pondelick has no responsibility for B/E's overall strategy or control, and MAG produced no evidence to the contrary. Mr. Pondelick does now lead one of the more ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████  A2970. ███████████████████████████████

███████  A2970-71. Mr. Pondelick also was elevated to this leadership position relatively recently, well after the accused device was designed and production had begun. A2791.

These facts make this case nothing like this Court's "privity" precedents, all of which "involve very close financial relationships in which the actual assignor almost envelopes the other entity." *Earth Res., Corp.*, 44 Fed. Cl. at 286.

### D.    The District Court Incorrectly Held B/E's Work With Mr. Pondelick To Avoid Infringing The Patents-In-Suit Was "Not Relevant"

This Court has stated that for assignor estoppel to apply "[w]hat is significant is whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Intel*, 946 F.2d at 839 (citing *Shamrock*). From its inception, B/E's relationship with Mr. Pondelick focused on *avoiding* infringement. B/E's successful, good-faith efforts to avoid infringement are highly relevant to assessing whether unfairness and injustice would be suffered by MAG.

The district court incorrectly concluded that B/E's work in good faith with the DBR law firm to *avoid* infringement was "not relevant." A9. The district court believed that its refusal to weigh B/E's good-faith efforts to avoid infringement (which were successful) was required by a statement in *Intel* that "an illicit purpose is not necessary to conclude that there was privity." *Id.* at 839; *see* A9. The district court read too much into that statement. That an illicit purpose to infringe is not *necessary* for privity does not mean that making successful, good-faith efforts to *avoid* infringement is not relevant to the equitable balance. Nowhere in *Intel* does this Court hold that a party's good-faith efforts to avoid infringement is irrelevant to the analysis or that such efforts should not be considered. B/E is not aware of any case that does so hold, before the district court's ruling here.

A categorical refusal to consider B/E's good faith efforts to avoid infringement does not properly weigh all the direct and indirect contacts between B/E and Mr. Pondelick, nor does it balance ***all*** the equities. *See, e.g., Intel*, 946 F.2d at 838. The district court's holding is prejudicial to inventors and market competitors who engage in design-around efforts and attempt to improve the technology beyond what has been patented, stifling innovation and competition. B/E's successful, good-faith efforts thus should have been weighed as part of the equitable balance. Those efforts to avoid infringement are at least relevant to a proper consideration of "the equities dictated by the relationship between the inventor and [the] company *in light of the act of infringement*." *Shamrock*, 903 F.2d at 793 (emphasis added).

### E.    The Balance Of Equities Demonstrates That No Assignor Estoppel Should Apply In This Case

The assignor estoppel doctrine is equitable in nature and requires a balance of the equities. *Diamond*, 848 F.2d at 1225 (the analysis "must be concerned mainly with the balance of equities between the parties."). A balance of the equities here, together with a consideration of the public interest, clearly shows that assignor estoppel should not apply in this case.

First, allowing B/E to challenge the validity of the asserted patents would not lead to an inequitable result for MAG. Notably, it was MAG's conduct which ultimately resulted in Mr. Pondelick gaining employment with

B/E. MAG purchased Envirovac, Mr. Pondelick's former employer and the original assignee of the patents-in-suit, and decided to shut down operations, leaving Mr. Pondelick and several of his colleagues unemployed. A2962. MAG also decided not to pursue the products Mr. Pondelick was working on at Envirovac, which were never sold to any customers. This is a small field, and Mr. Pondelick had few options. B/E's subsequent decision to hire Mr. Pondelick after MAG shuttered Envirovac and the relevant technology resulted in B/E producing a non-infringing product, which surely points to no unfairness to MAG.

Moreover, in its evaluation of the equities between the parties, the district court failed to consider MAG's unclean hands in bringing this suit. *See Precision Instrument Mfg. Co. v. Auto Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945) (holding that "he who comes into equity must come with clean hands"). MAG has pursued what it calls in an internal document a "B/E disruption strategy," a key part of which consisted of MAG's deliberate misappropriation of B/E's confidential information and MAG's intentional misuse of that misappropriated information to disparage the B/E vacuum toilet to customers. *See* A2971-74. In a balance of equities, MAG's unequitable business conduct should certainly be considered.

Finally, although *Diamond* is concerned "mainly" with the balance of equities between the parties, the public interest is not irrelevant. *Diamond*, 848

F.2d at 1225. Applying assignor estoppel on these facts discourages other companies from working with inventors in good faith to avoid infringing on a competitor's intellectual property rights. Efforts to design around patents promote innovation and advance technology, and so they serve the public interest and are to be encouraged. *State Indus. Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985). The district court's holding discourages companies like B/E from hiring talented inventors experienced in their field and formerly employed by competitors—an especially common occurrence in smaller fields, such as aircraft vacuum toilet engineering—and working to advance technology and design around patents.[11] This is against the public interest.

Further, the assignor estoppel doctrine inherently constrains the important public interest in allowing challenges to patent validity. *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 343 (1971) (in the public interest to ensure that patents "are kept within their legitimate scope"). The doctrine should not be expanded even further to cover situations such as this case where the inventor is not a founder of, major stakeholder in, or

---

[11] The district court's ruling also unfairly penalizes talented inventors who work in small fields (such as Mr. Pondelick) by diminishing their employment prospects. The assignor estoppel doctrine "was not designed to prevent companies from competing for talented employees." *Acushnet Co. v. Dunlop Maxfli Sports Corp.*, No. CIV. A. 98-717-SLR, 2000 WL 987979, at *3 (D. Del. June 29, 2000).

otherwise in a close financial relationship with B/E, and where B/E and the inventor acted in good faith to avoid infringement. Applying assignor estoppel here would unfairly deprive B/E of an important defense to MAG's unsubstantiated claims of infringement. Prohibiting challenges to the validity of patents in cases such as this encourages competitors to enforce questionable patents and attempt to hamper legitimate competition.

There is no privity here, and assignor estoppel should therefore not apply to B/E.

## CONCLUSION

The summary judgment of no infringement should be affirmed. Assignor estoppel, however, should not apply, and the dismissal of B/E's invalidity defense should be reversed.

Dated: July 23, 2015                    Respectfully submitted,

                                        IRELL & MANELLA LLP


                                        By: */s/ Andrei Iancu*                

                                              Morgan Chu
                                              Andrei Iancu
                                              Richard Birnholz
                                              Harry Mittleman
                                              Melissa Sedrish Rabbani
                                              Benjamin Haber

                                              1800 Avenue of the Stars, Suite 900
                                              Los Angeles CA, 90067
                                              Telephone: (310) 277-1010
                                              Facsimile: (310) 203-7199

                                              *Counsel for Defendant-Appellee and*
                                              *Cross-Appellant B/E Aerospace, Inc*

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

> Jul 23, 2015

- ☐ US mail
- ☐ Fax
- ☐ Hand
- ☒ Electronic Means
     (by email or CM/ECF)

| Benjamin Haber | /s/ Benjamin Haber |
|---|---|
| Name of Counsel | Signature of Counsel |

Law Firm    Irell & Manella LLP

Address    1800 Avenue of the Stars, Suite 900

City, State, ZIP    Los Angeles, CA 90067

Telephone Number    310-203-7934

FAX Number    310-203-7199

E-mail Address    bhaber@irell.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

Form 19

FORM 19.  Certificate of Compliance With Rule 32(a)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑     The brief contains [        15,220        ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐     The brief uses a monospaced typeface and contains [                    ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑     The brief has been prepared in a proportionally spaced typeface using [                Microsoft Word 2013                ] in [                14 pt., Times New Roman                ], or

☐     The brief has been prepared in a monospaced typeface using [                    ] with [ [                    ].

_____
(Signature of Attorney)

Benjamin Haber
_____
(Name of Attorney)
for Defendant-Appellee and Cross-Appellant.
_____
(State whether representing appellant, appellee, etc.)
July 23, 2015
_____
(Date)

Reset Fields